IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| JAMES A. CARDER, | ) | Civil Action No. 3:07-0137-CMC-JRM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |
| | ) | |

This case is before the Court pursuant to Local Rule 83.VII.02, et seq., D.S.C., concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB").

## ADMINISTRATIVE PROCEEDINGS

On February 18, 2003, Plaintiff applied for DIB. Plaintiff's application was denied initially and on reconsideration, and he requested a hearing before an administrative law judge ("ALJ"). After a hearing held May 16, 2005, at which Plaintiff appeared and testified, the ALJ issued a decision dated July 18, 2005, denying benefits and finding that Plaintiff was not disabled because he could perform his past relevant work as a dispatcher.

Plaintiff was 53 years old at the time of the ALJ's decision. He has a high school equivalent education and past relevant work as a cashier/sales associate, passenger/baggage screener, driver/messenger, and emergency telecommunicator and dispatcher. Plaintiff alleges disability

beginning November 21, 2002,[1] due to pancreatic tumors, fluid retention in his legs, heart disease, sleep disorder, diabetes mellitus, hearing loss, vision loss, and right foot arthritis.

The ALJ found (Tr. 20-21):

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's non-malignant pancreatic tumors and diabetes mellitus are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the following residual functional capacity: for light work; or work which involves occasionally lifting and/or carrying a maximum of 20 pounds; frequently lifting and/or carrying up to 10 pounds; and walking or standing six hours a day, or which requires sitting most of the time, but entailing pushing and/or pulling of arm and/or leg controls.

7. The claimant's past relevant work as dispatcher did not require the performance of work-related activities precluded by his residual functional capacity (20 CFR § 404.1565).

---

[1] In his brief, Plaintiff states that he is currently only seeking a closed period of benefits from November 21, 2002 to March 2005. He concedes improvement in his condition sometime after his recovery from surgery in September 2004 and March 2005, when the medical records indicate that he was able to exercise several times a week and reported no major ongoing complications. Plaintiff's Brief at 14; see Tr. 748 and 771.

2

> 8. The claimant's medically determinable impairments do not prevent the claimant from performing his past relevant work.
>
> 9. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(f)).

On December 20, 2006, the Appeals Council denied Plaintiff's request for review, making the decision of the ALJ the final action of the Commissioner. Plaintiff filed this action on January 16, 2007.

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971) and Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972). Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...." See 20 C.F.R. § 404.1505(a) and Blalock v. Richardson, supra.

## DISCUSSION

From approximately September 2000 to October 2003, Plaintiff was treated by Dr. Stuart Hook, an internist, for hypertension, elevated cholesterol, coronary artery disease, atrial fibrillation, upper respiratory infection, allergic rhinitis, a right foot injury, and chronic low back pain. Tr. 312-394. On April 22, 2002, Plaintiff sought treatment from Dr. Leon Khoury, a cardiologist, for fluid retention. Tr. 275. An echocardiogram revealed that Plaintiff had no pulmonary hypertension, masses, thrombi, vegetations, or pericardial effusion. He had normal left heart filling pressures,

ventricular size, systolic function, atrial size, mitral valve, pulmonic valve, and tricuspid valve. Plaintiff had low normal systolic function and grade I diastolic dysfunction. Tr. 274. A nuclear stress test was normal (Tr. 272) and a duplex exam showed mild plaque in Plaintiff's carotid arteries (Tr. 273).

In May 2002, Plaintiff was treated by Dr. W. Shawn Ghent, a sleep specialist, for breathing difficulties during sleep. Tr. 153-154. A sleep study indicated moderate obstructive sleep apnea. Tr. 155-165. A continuous positive air pressure ("CPAP") machine was prescribed. Tr. 150. On August 1, 2002, Plaintiff reported that he was feeling much improved, was not snoring, was sleeping less, and felt more energetic. Dr. Ghent discussed with Plaintiff the use of the CPAP machine, weight reduction, and an exercise program. Tr. 149.

An x-ray of Plaintiff's right foot in August 2002 revealed no generalized arthritic changes, probable early degenerative changes of Plaintiff's first metacarpophalangeal joint, and a small heel spur. Tr. 390. Plaintiff was treated by Kristin Koch, a clinical audiologist, on September 11, 2002. Ms. Koch noted that Plaintiff previously underwent an audiological evaluation which showed mild to moderate sensorineural hearing loss, with his left ear slightly worse than his right ear. She noted that aided test results with a hearing aid in Plaintiff's left ear "revealed significant benefit across all frequencies" and recommended a hearing aid for his left ear. Tr. 306-312.

In October 2002, Dr. Hook treated Plaintiff for hypertension, possible pancreatitis, and gout. Tr. 327-328, 334-339. Abdominal CT scans revealed probable pancreatitis and that Plaintiff's left kidney was smaller than his right kidney. Tr. 330. A renogram indicated fairly good kidney function (the left kidney did not function as well as the right) and no evidence of renal artery stenosis. Tr. 329.

On November 4, 2004, Plaintiff was examined by Dr. Siva Chockalingam, a gastroenterologist. Plaintiff reported abdominal pain, weight loss, reflux, and dysphagia. Tr. 202-203. A colonoscopy on November 6, 2002, revealed proctitis and internal hemorrhoids. Tr. 187-191. On November 7, 2002, esophagogastroduodenoscopy revealed that Plaintiff had a Schatzki ring (lower esophageal mucosal ring of annular, thin, web-like tissue), multiple pale ulcers of the antrum, and duodentitis. Tr. 193-198. An endoscopic retrograde cholangiopancreatography ("ERCP") study was performed on November 21, 2002. Dr. Chockalingam's impression was a successfully cannulated pancreatic duct; pancreas divisum; cobblestoned/edematous erythematous, friable, granular, and white mucosa of the major papilla; unsuccessful attempts to cannulate the common bile duct; and a nodule in the duodenum. Tr. 205-206, 209-215. A biopsy of the duodenal nodule indicated adenomatous changes in Plaintiff's small bowel. Tr. 207-208, 222.

Later that day, Plaintiff complained of severe abdominal pain and Dr. Chockalingam diagnosed Plaintiff with post-ERCP pancreatitis and a pancreatic mass. Plaintiff was admitted to the hospital for tests, intravenous fluids, antibiotics, and pain medication. Tr. 200-201. An abdominal CT scan revealed that Plaintiff had an enlarged pancreas, likely pancreatitis, and left kidney atrophy. Tr. 227-228. An echocardiogram on November 25, 2002, showed no thrombus, pericardial effusion, or vegetation. Plaintiff's atrial size, aortic valve, tricuspid valve, and mitral valve appeared normal. Tr. 221. A CT scan showed mild left ventricular enlargement and aortic insufficiency. Tr. 225. On November 26, 2002, a chest x-ray indicated atelectasis in Plaintiff's left lung base. Tr. 226. On December 1, 2002, Plaintiff reported no abdominal pain, did not require pain medication, and was discharged in stable condition. Tr. 217-220.

On December 19, 2002, Plaintiff was evaluated by Dr. Shyam Varadarajulu, a gastroenterologist. Tr. 297. Dr. Varadarajulu noted that Plaintiff had developed diabetes, was on insulin, and had lost 45 pounds. An ultrasound revealed a hypoechoic mass in Plaintiff's pancreas, suspicious for neuroendocrine tumor, and focal pancreatitis. Fine needle aspiration was negative for malignant cells. Tr. 298-300.

A whole body PET scan revealed no evidence of metastatic disease on January 10, 2003. Tr. 267. On February 13, 2003, a followup endoscopic ultrasound showed probable focal pancreatitis and a fine needle aspiration test was negative for malignant cells. Tr. 294-295.

Plaintiff was evaluated by Dr. Mohammed Yousufuddin, a surgeon, on March 13, 2003. Dr. Yousufuddin noted that Plaintiff had no clinical jaundice or masses of his neck; a clear chest; normal heart sinus rhythm; no abdominal tenderness, masses, or organomegaly; unremarkable extremities; and an otherwise unremarkable physical examination. He recommended that Plaintiff undergo exploratory surgery and a possible Whipple procedure (where all or part of the pancreas is excised together with the duodenum). Tr. 286. On March 27, 2003, Plaintiff underwent heart catheterization which revealed mild coronary artery disease, hypertensive heart disease with moderate left ventricular diastolic dysfunction, and mild aortic stenosis. Plaintiff was cleared to undergo a Whipple procedure. Aggressive medical therapy for his cardiovascular condition was to be continued. Tr. 230-233, 265-266. On March 31, 2003, a chest x-ray showed that Plaintiff had mild cardiomegaly. Tr. 285. An abdominal CT scan revealed no definite pancreatic mass and a "smallish" left kidney on April 7, 2003. Tr. 282.

On April 2003, Dr. Hook completed an "Evidence of Record Medical Report" in which he noted that Plaintiff was alert and oriented and had clear lungs, regular heart rate and rhythm, soft

abdomen, bowel sounds, and no extremity clubbing, cyanosis, or edema. He diagnosed Plaintiff with diabetes mellitus, hypertension, gastroesophageal reflux disease ("GERD"), elevated cholesterol, coronary artery disease, obstructive sleep apnea, and pancreatic tumor. He stated that all of Plaintiff's medical problems, except for his diabetes and pancreatic mass, were well-controlled. He also opined that Plaintiff was in "reasonably good medical shape," but was easily fatigued and required frequent rest room visits due to diabetes. Tr. 319-322.

From June 16 to 19, 2003, Plaintiff was treated at Providence Hospital in Columbia, South Carolina for complaints of uncontrolled blood pressure, left-sided facial numbness, difficulty talking, and shortness of breath. Plaintiff's discharge diagnosis was uncontrolled hypertension, now controlled; facial paraesthesia, resolved; history of atherosclerotic coronary artery disease; and insulin dependent diabetes mellitus. Tr. 235-243. An x-ray of Plaintiff's chest showed no evidence of active disease and a CT scan of his head was negative. Tr. 260-261. On June 18, 2003, a brain MRI showed no acute findings and an abdominal CT scan showed no renal artery narrowing or occlusion. Tr. 257-259. An echocardiogram revealed normal left ventricular size and function with mild left ventricular hypertension and aortic valve calcification with mild aortic valve stenosis. Tr. 244-245, 247-248.

On July 17, 2003, Plaintiff returned to Dr. Khoury for follow-up. Dr. Khoury recommended follow-up in four to six months and noted that Plaintiff was stable and able to undergo surgery. Tr. 263.

On July 21, 2003, an abdominal CT scan showed a hypodense lesion at the head of Plaintiff's pancreas, suspicious for malignancy. Tr. 383-384. A PET scan on July 28 2003, revealed no evidence of metastatic disease or pancreatic lesion. Tr. 381-382. On July 29, 2003, Dr.

Yousufuddin diagnosed pancreatic head changes and recommended a follow-up endoscopy ultrasound. Tr. 281. On August 28, 2003, Dr. Philip Kinder, a urologist, noted that Plaintiff was urologically asymptomatic and "everything [was] basically fine" with Plaintiff's kidneys. Tr. 288.

Plaintiff was evaluated by Dr. William Babcock, an oncologist, on September 18, 2003. Dr. Babcock diagnosed persistent pancreatic abnormality, recent onset diabetes mellitus, coronary artery disease, status post transient ischemic attack, and high blood pressure on treatment. He recommended a repeat biopsy. Tr. 399-402.

On September 22, 2003, an echocardiogram showed normal left ventricular valve systolic function and mild aortic valve stenosis. Tr. 728-729, 761-762. On September 24, 2003, endoscopic ultrasound revealed findings consistent with resolving focal chronic pancreatitis and fine needle aspiration test indicated findings suggestive of neuroendocrine neoplasm. Tr. 290, 292-293. On October 13, 2003, Dr. Brenda Hoffman recommended a repeat CT scan in three months. Tr. 291. Plaintiff reported to Dr. Babcock that he felt well on October 16, 2003, and Dr. Babcock recommended that Plaintiff follow-up in six months. Tr. 396. In February 2004, an echocardiogram showed no gross masses in Plaintiff's cardiac chambers, normal systolic function and tricuspid valve; thickened mitral valve leaflets; left ventricular diastolic dysfunction; and mild left atrial dilation. Tr. 749.

Beginning in August 2004, Plaintiff sought treatment at the Veterans Administration Medical Center ("VAMC") in Columbia, South Carolina. In August 2004, Dr. Richard Gardner, an optometrist at the VAMC, noted that Plaintiff did not demonstrate any diabetic retinopathy. Tr. 630-632. On August 23, 2004, Plaintiff was examined by Dr. Mohammed Wallam, an oncologist. Dr.

Wallam diagnosed Plaintiff with a pancreatic neuroendocrine tumor and recommended a surgical consultation. Tr. 626-630. On August 25, 2004, Dr. Kirk Peterson, a surgeon, noted that Plaintiff was well, but fatigued. He instructed Plaintiff to stop taking Plavix. Plaintiff reported that he worked in the yard and ambulated independently in community limits. Dr. Peterson recommended a Whipple procedure. Tr. 618-26, 636-643.

On September 2, 2004, Dr. Stephen Fann and Dr. James Nottingham performed a Whipple procedure, exploratory laparotomy, and gastric polyp resection surgery. They also performed a portal lymph node biopsy and placed a feeding tube and site pain pump. Tr. 416-17, 545-558. Drs. Fann and Nottingham noted that the portal node frozen section was negative for malignancy and Plaintiff had no significant celiac nodes. There was fullness of mesentery from root distal lipoma versus soft mass/nodes; pancreaticojejunostomy end-to-side, two layer, hand-sewn; cholodochojejunostomy end-to-side single layer; gastric polyp node intersecting at the gastrojejunostomy; and well-circumscribed pancreatic lesion, with negative surgical margins. Tr. 416-417, 545-546. Plaintiff was transferred to the intensive care unit, where he was on a ventilator for a week and a half after difficulty being extubated. He developed pneumonia which was treated with antibiotics. Tr. 416-417, 419-422, 432-435, 454-457, 467-471, 473-543, 578-579, and 591-600. Plaintiff was discharged on September 20, 2004, with instructions to keep follow up appointments as scheduled, follow his diet as tolerated, lift no more than thirty pounds, and do no strenuous activity. Tr. 416-417, 427-428.     On October 27, 2004, Dr. Ian Reight performed a post-surgical evaluation. Plaintiff complained of occasional reflux, improved with a wedge pillow and diet modification. Dr. Reight noted the final biopsy results from Plaintiff's Whipple procedure, which showed no evidence of malignancy in the portal lymph node; chronic cholecsystitis with

reactive papillary hyperplasia in the gallbladder; islet cell hyperplasia of undetermined origin; benign peri-pancreatic and peri-gastric lymph node; benign omental tissue; fundic gland polyps; gastric heterotopia; and serosal adhesions. He stated that he would not render a definitive malignant diagnosis of the pancreatic tissues, but the tissues most likely represented an area of pancreatic atrophy with a coalescence of islets. Dr. Reight stated he was concerned about the possibility of an associated occult malignancy not represented by the tissue. Tr. 704-705. On October 29, 2004, Dr. Reight completed a "Medical Source Statement" concerning Plaintiff's physical capacities. Tr. 601-604.

On November 5, 2004, Karen Covington (a nurse practitioner at the VAMC) noted that Plaintiff's diabetes was "well-controlled" with diet and exercise, his hypertension was well controlled, and his GERD was stable. Charlotte Sweet, a VA nurse, instructed Plaintiff to begin exercising, starting slowly with a goal of 20-30 minutes three times per week. Tr. 608-613, 670-675, 698-704.

On November 22, 2004, Plaintiff reported to Dr. Wallam that he lost forty pounds during the previous three months, had a normal appetite, no diarrhea, and resolved flushing after surgery. Dr. Wallam diagnosed questionable pancreatic neuroendocrine tumor and recommended that Plaintiff receive CT scans in three months and be seen by a cardiologist. Tr. 663-66, 691-694. On December 3, 2004, Dr. Guillermo Pineda, a cardiologist, examined Plaintiff. An echocardiogram revealed normal left ventricular systolic function, mild left ventricular diastolic dysfunction, and normal right heart hemodynamics. Tr. 683-687, 690-691, 725-726, 757-758. A thoracic CT scan on December 16, 2004, indicated two small atypical lymph nodes along the azygos vein. Tr. 676-678.

Dr. Tu Lin, an endrocronologist, examined Plaintiff on January 5, 2005. Dr. Lin noted that Plaintiff was off insulin completely. Dr. Lin diagnosed questionable pancreatic tumor and diabetes mellitus. Tr. 688-690, 722-724. On January 19, 2005, Plaintiff reported to Dr. Wallam that he had gained eight pounds and had a normal appetite. Tr. 716-722. A pulmonary function test was essentially normal in February 2005. Tr. 727. An echocardiogram revealed a dilated left ventricle with normal global systolic function and tricuspid valve; mild left atrial dilation, and diastolic dysfunction. Tr. 756-758.

In March 2005, Plaintiff was examined by Dr. Catherine Sarbah. Plaintiff reported that he was walking an eighteen minute mile on the treadmill and indoor track three times per week. Dr. Sarbah noted that Plaintiff was in no acute distress, well-developed, well-nourished, alert and oriented. His skin, heart rate and rhythm, lungs, abdomen, cranial nerves, muscle strength, and extremities were normal. Dr. Sarbah diagnosed Plaintiff with mild coronary artery disease by history; well-controlled hypertension; diabetes; status post-Whipple procedure; and left-sided carotid bruits. Tr. 748-753. In April 2005, a duplex study showed no plaque or stenosis in Plaintiff's carotid arteries. Tr. 736, 763. A thoracic CT in May 2005 showed no changes since the previous CT scan. Tr. 764-766. In May 2005, Dr. Lin adjusted Plaintiff's medications. Tr. 744-746.

Plaintiff alleges that: (1) the ALJ's assessment of the Plaintiff's functional capacity did not consider Plaintiff's inability to maintain a work schedule due to absences from work resulting from his illness; and (2) the ALJ failed to properly assess his treating physician's opinion.

A.     <u>Substantial Evidence/Residual Functional Capacity</u>

Plaintiff alleges that the ALJ's decision is not supported by substantial evidence. In particular, Plaintiff alleges that the ALJ erred in assessing Plaintiff's residual functional capacity

11

("RFC") by failing to consider Plaintiff's inability to maintain a work schedule due to absences from work resulting from his illness. The Commissioner contends that the Commissioner's final decision is supported by substantial evidence and free of legal error. Specifically, the Commissioner contends that the ALJ properly considered the medical and other evidence of record in determining that Plaintiff had the RFC to perform light work.

Substantial evidence is:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence".

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966). It must do more, however, than merely create a suspicion that the fact to be established exists. Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

The ALJ's determination that Plaintiff had the RFC to perform light work, and thus could perform his past relevant work as a dispatcher, is supported by substantial evidence. Significantly, with the exception of Dr. Reight (discussed further below), none of Plaintiff's treating or examining physicians placed any restrictions which would preclude his performing light work. See Lee v. Sullivan, 945 F.2d 687, 693 (4th Cir. 1991)(finding that no physician opined that claimant was totally and permanently disabled supported a finding of no disability); Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)(treating physician's opinion entitled to great weight). The ALJ's decision is supported by the medical treatment notes (including those of Plaintiff's family physician Dr. Hook and records from the VAMC), objective testing, and non-medical evidence. Additionally, as noted by the ALJ (Tr. 19), Plaintiff's treatment (other than his 2004 surgery) has been conservative and

typically limited to medication and medication levels have remained rather constant, suggesting effective management of symptoms.

Although Plaintiff suffered from cardiovascular symptoms, a November 2002 echocardiogram showed no thrombus, effusion, or vegetation; normal atrial size and valvular function; and only "mild" left ventricular enlargement and aortic insufficiency. Tr. 221, 225. In March 2003, left heart catheterization showed "mild" coronary artery disease and aortic stenosis, and "moderate" left ventricular diastolic dysfunction. Tr. 230-33, 265. A chest x-ray revealed "mild" cardiomegaly. Tr. 285. In June 2003 a carotid duplex study showed "some" plaque" (Tr. 246), but a brain MRI showed no acute findings (Tr. 257) and an echocardiogram showed normal left ventricular size with mild left ventricular hypertension and aortic valve stenosis (Tr. 244-245, 247-248. Other than Plaintiff's four day hospitalization in June 2003, Plaintiff's cardiac treatment was generally limited to monitoring his blood pressure and adjusting his medications. Plaintiff's hypertension was controlled and his facial paresthesia was resolved at the time of his June 2003 hospital discharge. Tr. 235-236. An echocardiogram in September 2003 revealed that Plaintiff had normal left ventricular valve systolic function and only mild aortic valve stenosis (Tr. 728-729, 761-762). In February 2004, another echocardiogram showed no masses, normal systolic function and tricuspid valve, and mild left atrial dilation (Tr. 749). In March 2005, Plaintiff's coronary artery disease was described as mild, and his hypertension was noted to be well-controlled. Tr. 748-753. A duplex study in April 2005 showed no carotid artery plaque or stenosis. Tr. 736, 763.

Although Plaintiff was hospitalized in November 2002 for pancreatitis and pancreatic mass, he was discharged in stable condition, had no abdominal pain, and did not require any pain medication. Tr. 200-201, 217-220, 227-228. In March 2003, it was noted that Plaintiff experienced

"some epigastric pain off and on" since October 2002, and had no jaundice, neck masses, abdominal tenderness, abdominal masses, or organomegaly. Tr. 286. At the time of his discharge from his hospitalization for the Whipple procedure in September 2004, Drs. Jones and Nottingham only restricted Plaintiff from lifting more than thirty pounds or performing "strenuous" activities. Tr. 416-417, 427-428.

Plaintiff's diabetes did not require any emergency room visits or hospitalizations for hypoglycemia or hyperglycemia. Following his Whipple procedure, Plaintiff did not require insulin anymore, and his diabetes was "well-controlled" with diet, exercise, and oral medications. Tr. 608-612, 670-674, 698-703. Although Plaintiff complained of vision problems from diabetes, the medical evidence showed he did not have diabetic retinopathy. Tr. 630-632.

Plaintiff suffered a hearing loss, but audiologist Ms. Koch found that Plaintiff had significant benefit with a hearing aid. Tr. 306-312. His moderate sleep apnea was "much improved" with a CPAP machine. Tr. 149-152.

The ALJ's decision is also supported by Plaintiff's daily activities. In August 2004, just prior to his Whipple procedure, Plaintiff reported to Dr. Peterson that he worked in the yard and ambulated independently in community limits. Tr. 618-626, 636-643. In March 2005, Plaintiff reported to Dr. Sarbah that he walked three times a week. Tr. 748-753.

In determining Plaintiff's RFC, the ALJ also considered Plaintiff's credibility, his pain levels, and the effects of his medications. On his medication lists, Plaintiff reported no side effects from his medications. Tr. 63, 66, 146. Other than pain medication during his hospitalizations, Plaintiff did not require any strong pain medication, taking only Celebrex for arthritis.

The ALJ's determination that Plaintiff had the RFC to perform a range of light work is also supported by the findings of the State agency medical consultant. See 20 C.F.R. §§ 404.1527(f)(2) and 416.927(f)(2); SSR 96-6p ("Findings of fact made by State agency ... [physicians ]... regarding the nature and severity of an individual's impairments must be treated as expert opinion of non-examining sources at the [ALJ] and Appeals Council level of administrative review."). In February 2004, Dr. Robert Kukla, a State agency physician, reviewed Plaintiff's medical records and opined that Plaintiff could perform medium work that did not require more than occasional climbing of ladders, ropes, or scaffolds, or more than frequent climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. Tr. 405-412.

As the ALJ found, the medical evidence showed that Plaintiff's impairments improved with medication and other treatment. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." Gross v. Heckler, 785 F.2d 1163, 1165-6 (4th Cir. 1986). In July 2003, Dr. Khoury wrote that Plaintiff's hypertension was controlled (Tr. 235-236), and in March 2005, Dr. Sarbah noted that Plaintiff's hypertension was "well-controlled" (Tr. 748-753).

The ALJ's determination that Plaintiff could perform his past relevant work as a dispatcher is supported by substantial evidence. In his Work History Report, Plaintiff wrote that his work as a dispatcher required an eight-hour day, with seven hours of sitting, one-half hour of reaching; and no walking standing, climbing, stooping, kneeling, crouching, crawling, handling, or lifting. Tr. 75. Plaintiff's RFC for light work did not preclude this work as a dispatcher, which was sedentary as described in the Work History Report.

The Commissioner contends that there is no merit to Plaintiff's argument that he could not work between November 2002 and March 2005 because his medical treatment was so extensive.

As discussed above, substantial evidence supports the ALJ's decision that Plaintiff could perform light work during this period. Aside from his lengthy hospital stay for his pancreatic surgery (September 2004), Plaintiff only required short hospitalizations on two other occasions (November 21 to December 2002 and June 16 to 19, 2003) during the time he alleges he was disabled. As noted by the Commissioner, there are no records of treatment from June 19, 2003 when Plaintiff was discharged from his hospitalization for hypertension-related symptoms (Tr. 237-239) and July 17, 2003 when he was examined by Dr. Khoury (Tr. 263); from July 29, 2003 when he was examined by Dr. Yousufauddin (Tr. 281) and August 28, 2003 when he saw Dr. Kinder (Tr. 288); from October 16, 2003, when he was examined by Dr. Babcock (Tr. 396), and February 2004 when he underwent an echocardiogram (Tr. 749); and from February 2004 to August 2004 when he established treatment at the VAMC (Tr. 630-632).

      B.     <u>Treating Physician</u>

Plaintiff alleges that the ALJ failed to properly assess the opinion of his treating physician, Dr. Reight. In a medical source statement dated October 29, 2004, Dr. Reight opined that Plaintiff was restricted to lifting or carrying less than ten pounds on only an occasional basis; had maximum standing or walking limited to ten to fifteen minutes; maximum sitting of thirty minutes or less; very little climbing; and no stooping, crouching, kneeling, or bending. Tr. 601-604. Plaintiff alleges that none of the specific instances cited by the ALJ constitutes a substantial basis to dismiss Dr. Reight's opinion. The Commissioner contends that the ALJ's finding that Dr. Reight's opinion was not entitled to controlling weight is supported by substantial evidence.

Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1988), and Foster v. Heckler, 780 F.2d 1125, 1130 (4th Cir. 1986). In those cases, the court emphasized the importance of giving great weight to the findings of the plaintiff's treating physician. See also Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983). The court in Mitchell also explained that a treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." An ALJ, therefore, must explain his reasons for disregarding a positive opinion of a treating physician that a claimant is disabled. DeLoatche v. Heckler, 715 F.2d 148 (4th Cir. 1983).

The Commissioner is authorized to give controlling weight to the treating source's opinion if it is not inconsistent with substantial evidence in the case record and it is well supported by clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1527(d)(2). The Court in Craig found by negative implication that if the physician's opinion "is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 589.

The ALJ's decision that Dr. Reight's October 2004 opinion was not entitled to controlling weight is supported by substantial evidence and correct under controlling law. The ALJ specifically found that Plaintiff's medical record did not support Dr. Reight's level of work restrictions. He discussed at length the findings of Plaintiff's treating physicians and specifically found that Dr. Reight's limitations were not supported by the notes of Dr. Hook and the VAMC. Dr. Reight's limitations are also not supported by the objective medical evidence, as discussed above. Further,

17

Dr. Reight's opinion is based on review of hospital records and examination of Plaintiff approximately one month after his hospital discharge, not on a long, ongoing physician/patient relationship. Dr. Reight's limitations are not supported by the September 2004 hospitalization notes and discharge summary noting that Plaintiff had a low pain level of one (on a scale of one to ten) and instructing Plaintiff not to lift over thirty pounds or engage in strenuous activity. Additionally, even if Dr. Reight's opinion is given full weight, it does not indicate a continuous twelve month period in which he was disabled, as the opinion was rendered in October 2004, and Plaintiff concedes that his condition improved by March 2005.

Plaintiff alleges that the ALJ erred by discounting of Dr. Reight's opinion based on an August 2004 medical note (Tr. 619) that Plaintiff was working at Home Depot because Plaintiff's earning records showed that Plaintiff's last earnings were in 2002. This, at most, is harmless error, because it was only one of the reasons cited by the ALJ in discounting Dr. Reight's opinion. See Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994)(affirming denial of benefits where the ALJ erred in evaluating a claimant's pain because "he would have reached the same result notwithstanding his initial error").

## CONCLUSION

Despite Plaintiff's claims, he fails to show that the Commissioner's decision was not based on substantial evidence. This Court may not reverse a decision simply because a plaintiff has produced some evidence which might contradict the Commissioner's decision or because, if the decision was considered de novo, a different result might be reached.

This Court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence, Richardson v. Perales, supra. Even where a

plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision, <u>Blalock v. Richardson</u>, <u>supra</u>.  The Commissioner is charged with resolving conflicts in the evidence, and this Court cannot reverse that decision merely because the evidence would permit a different conclusion.  <u>Shively v. Heckler</u>, <u>supra</u>.  It is, therefore,

RECOMMENDED that the Commissioner's decision be affirmed.

Respectfully submitted,

s/Joseph R.  McCrorey
United States Magistrate Judge

January 11, 2008
Columbia, South Carolina